UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF NEW YORK

_____

UNITED STATES OF AMERICA,

v.                                              6:17-CR-06173 EAW

BIN WEN a/k/a Ben,

        Defendant.

_____

UNITED STATES OF AMERICA,

v.                                              6:17-CR-06174 EAW

PENG ZHANG a/k/a Jessica,

        Defendant.

_____

**DECISION AND ORDER**

**I.**     **INTRODUCTION**

Defendants Bin Wen ("Wen") and Peng Zhang ("Zhang") (collectively "Defendants") are currently awaiting sentencing. Wen pleaded guilty to a two-count Information charging (1) a violation of 18 U.S.C. § 1349 (conspiracy to commit wire fraud) and (2) a violation of 18 U.S.C. § 1957(a) (engaging in monetary transactions in property derived from specified unlawful activity), and Zhang pleaded guilty to a one-count Information charging a violation of 18 U.S.C. § 371 (conspiracy to defraud the United States). (Case No. 6:17-cr-06173, Dkt.

43; Case No. 6:17-cr-06174, Dkt. 41).[1] Defendants filed voluminous objections to the Presentence Investigation Reports (Wen Dkt. 53; Zhang Dkt. 49), which the Court resolved in a Decision and Order issued December 21, 2018 (Wen Dkt. 73; Zhang Dkt. 73) (the "December 21st Decision"). Defendants have now filed motions for reconsideration of portions of the December 21st Decision. (Wen Dkt. 74; Zhang Dkt. 74). For the reasons discussed below, Defendants' motions for reconsideration are denied.

## II. FACTUAL AND PROCEDURAL BACKGROUND

The factual background and procedural history of these cases is set forth in detail in the December 21st Decision, familiarity with which is assumed for purposes of this Decision and Order.

Defendants filed the instant motions for reconsideration on January 4, 2019. (Wen Dkt. 74; Zhang Dkt. 74). The Government filed responses on January 23, 2019. (Wen Dkt. 77; Zhang Dkt. 78). Sentencing is scheduled for February 6, 2019.

## III. DISCUSSION

### A. Standard of Review

The Federal Rules of Criminal Procedure do not expressly provide for motions for reconsideration. "However, motions for reconsideration in criminal cases have traditionally been allowed within the Second Circuit." *United States v. Yannotti*, 457 F. Supp. 2d 385, 388 (S.D.N.Y. 2006); *see also United States v. Gillespie*, 264 F. Supp. 3d 462, 466 (W.D.N.Y.

---

[1] Hereinafter, references to the docket in Case No. 17-cr-06173 are denoted as "Wen Dkt. __" and references to the docket in Case No. 17-cr-06174 are denoted as "Zhang Dkt. __."

2017) ("Although the Federal Rules of Criminal Procedure do not specifically recognize motions for reconsideration, such motions have traditionally been allowed within the Second Circuit.") (quotation omitted). "District courts have applied the applicable civil standard to such motions in criminal cases." *Gillespie*, 264 F. Supp. 3d at 466 (quotation omitted).

As the Second Circuit has explained:

> The standard for granting . . . a motion [for reconsideration] is strict, and reconsideration will generally be denied unless the moving party can point to controlling decisions or data that the court overlooked—matters, in other words, that might reasonably be expected to alter the conclusion reached by the court.

*Shrader v. CSX Transp., Inc.*, 70 F.3d 255, 257 (2d Cir. 1995). Recognized grounds for reconsideration include "an intervening change of controlling law, the availability of new evidence, or the need to correct a clear error or prevent manifest injustice." *Virgin Atl. Airways, Ltd. v. Nat'l Mediation Bd.*, 956 F.2d 1245, 1255 (2d Cir. 1992) (citation omitted). "These criteria are strictly construed against the moving party so as to avoid repetitive arguments on issues that have been considered fully by the court." *Boyde v. Osborne*, No. 10-CV-6651, 2013 WL 6662862, at *1 (W.D.N.Y. Dec. 16, 2013) (quoting *Griffin Indus., Inc. v. Petrojam, Ltd.*, 72 F. Supp. 2d 365, 368 (S.D.N.Y. 1999)).

"[A] motion to reconsider should not be granted where the moving party seeks solely to relitigate an issue already decided." *Shrader*, 70 F.3d at 257; *see also Davidson v. Scully*, 172 F. Supp. 2d 458, 461 (S.D.N.Y. 2001) ("A motion for reconsideration may not be used to advance new facts, issues or arguments not previously presented to the Court, nor may it be used as a vehicle for relitigating issues already decided by the Court."). The decision to grant or deny a motion for reconsideration is within "the sound discretion of the district

court. . . ." *Aczel v. Labonia*, 584 F.3d 52, 61 (2d Cir. 2009) (citation omitted). "Reconsideration of a court's previous order is an 'extraordinary remedy to be employed sparingly in the interests of finality and conservation of scarce judicial resources.'" *Parrish v. Sollecito*, 253 F. Supp. 2d 713, 715 (S.D.N.Y. 2003) (quoting *In re Health Mgmt. Sys. Inc. Secs. Litig.*, 113 F. Supp. 2d 613, 614 (S.D.N.Y. 2000)).

### B. <u>Reconsideration Is Not Warranted</u>

Defendants make three arguments in support of their request for reconsideration. First, they argue that the Court erred in finding that Defendants bear the burden of production with respect to the fair market value of the services they claim to have provided to the Government. (Wen Dkt. 74 at 1). Second, they argue that the Court erred in finding the Government made a *prima facie* showing that the loss in this case was $8,410,900. (*Id.*). Third, they argue that even if they did bear the burden of production with respect to the fair market value of their services, the Court erred in finding they had failed to satisfy it. (*Id.*).

As addressed below, the Court has considered each of Defendants' arguments and finds them without merit. However, as an initial matter, the Court notes that it agrees with the Government's general statement that the dispute here "has little to do with burden shifting but rather the facts required to apply the loss enhancement." (Wen Dkt. 77 at 3). In other words, the decisive factor in the Court's loss determination was not its conclusions with respect to any burden shifting. Rather, the critical point was that the Court agreed with the Government's characterization of the nature of the relationship between the parties. The Government portrayed the moneys provided to Defendants as "grants" representing "unilateral transfers of money and not a bargained-for exchange of money for services," and

therefore, the Government posited that it did not receive what it expected—namely that the money would facilitate the development of innovative scientific research through Defendants' minority-owned small business with the ultimate goal of commercialization. (*Id.*). In contrast, Defendants characterized the moneys as paid pursuant to "contracts" and they argued that they fully performed under the "contracts" to the Government's complete satisfaction (even though they fraudulently misrepresented who would be involved in the research and who had invested in Defendants' business). Thus, according to Defendants, they were entitled to the fair market value of the services provided which equaled the full value of the "contracts." (Wen Dkt. 53 at 14-15).

The Court agreed with the Government concerning the factual basis of the parties' relationship. As a result, the Court also agreed with the Government that Defendants' fraudulent conduct deprived the Government of the ability to fund legitimate small businesses through the SBIR/STTR programs, and any scientific research produced by Defendants was rendered useless to the Government because of Defendants' fraud. The Government proved that the Defendants' research, reports, and activities did not confer a benefit on the Government, and thus the Government proved that its loss amounted to the full amount of moneys paid to Defendants ($8,410,900).[2] The Court's conclusion in this regard has nothing

---

[2] The Sentencing Commission has explained that loss is intended to account for economic benefits transferred to a victim, thus reflecting a net loss approach: "This approach recognizes that the offender who transfers something of value to the victim(s) generally is committing a less serious offense than an offender who does not." U.S.S.G. App. C. Amendment 617 (Reason for amendment) (Nov. 1, 2001). Because the Court agreed with the Government's depiction of the nature of the arrangement with Defendants, it correspondingly concluded that there was no benefit or value transferred from Defendants to the Government in exchange for the moneys paid to Defendants.

to do with its observations concerning Defendant's failure to produce evidence establishing a credit against the Government's established loss. The Government met its burden of persuasion and established that its loss equaled all moneys paid to Defendants. The Government established that if it had been aware of the true nature of Defendants' business—that Scott Cicora, Colleen Costello, and James Burlitch did not have the roles in UEE represented by Defendants and none of the employees hired by UEE had the combination of education and experience held by Mr. Cicora, Dr. Costello, and Dr. Burlitch; that the third-party investors identified by Defendants were shams; and that Defendants failed to record their time on projects accurately and made other similar misrepresentations—the USDA, NSF, and DOE would not have awarded Defendants moneys under the SBIR/STTR programs. (*See* Wen Dkt. 61-16 at ¶¶ 7-9, 11, 15; Wen Dkt. 61-17 at ¶¶ 7-9, 12; Wen Dkt. 61-20 at ¶¶ 6-8, 10). Defendants failed to come forward with credible evidence rebutting the Government's loss figure, and thus, the Court allocated the full amount of the moneys paid to Defendants as the loss.

1. **The Court Appropriately Allocated the Burden of Production**

With respect to the allocation of the burden of production, the cases within the Second Circuit cited by Defendants stand for nothing more than the unremarkable proposition that the Government bears the burden of establishing the loss amount for purposes of sentencing. The Court expressly acknowledged and applied this well-established rule throughout the December 21st Decision. (*See, e.g.,* December 21st Decision at 27 ("In the particular context of sentencing enhancements, it is well-established that the Government bears the burden of

establishing, by a preponderance of the evidence, the amount of the loss for purposes of the sentencing enhancement." (quotation and alteration omitted))).

There is no inconsistency between the rule that the Government bears the burden of showing loss and a corollary rule that, once the Government has borne that burden, Defendants cannot simply make unsupported assertions that they provided a valuable service. Defendants must produce evidence to support that claim. As discussed in the December 21st Decision, such a corollary rule is consistent with the general principle that "the burden of proof as to a given issue is normally placed on the party that has an affirmative goal and presumptive access to proof." *United States v. Smathers*, 879 F.3d 453, 460-61 (2d Cir. 2018).[3] Moreover, and again as set forth in the December 21st Decision, numerous courts have adopted such a rule. *See, e.g., United States v. Washington*, 715 F.3d 975, 984-85 (6th Cir. 2013); *United States v. Borrasi*, 639 F.3d 774, 783 (7th Cir. 2011).

*United States v. Harris*, 821 F.3d 589 (5th Cir. 2016), on which Defendants rely, is not to the contrary. In *Harris*, the Fifth Circuit indicated that it was the Government's burden to show "any difference between the contract price and the fair market value of the services rendered by the [defendants]." *Id.* at 607. However, in *Harris*, the district court had expressly found that the victims "got what they paid for." *Id.* Accordingly, the issue in *Harris* was not

---

[3] The Court recognizes that *Smathers* dealt with restitution, but that does not render its teachings irrelevant. Contrary to Defendants' contention (Wen Dkt. 74 at 5 n.2), the so-called "unique text" of the Mandatory Victims Restitution Act does not establish all burdens of the parties, and rather states that the burden of establishing the loss amount is on the government, the burden of demonstrating the defendant's financial resources is on the defendant, and "[t]he burden of demonstrating such other matters as the court deems appropriate shall be upon the party designated by the court as justice requires." 18 U.S.C. § 3664(e).

who bore the initial burden of production with respect to fair market value, but who bore the ultimate burden of persuasion.[4]

In this case, the Court expressly found that the Government "has the initial burden of establishing the loss amount (and always retains the burden of persuasion)" (December 21st Decision at 29) and held the Government to that burden. *Harris* therefore does not contradict the Court's holding in the December 21st Decision. Rather, unlike *Harris*, the Court here concluded that the Government met its burden to establish that it did <u>not</u> get what it paid for—far from it. The Government established that the fraud that permeated Defendants' activities and representations rendered worthless the services provided by Defendants and caused a loss of the full amount of the moneys provided by Defendants, thus shifting to Defendants the obligation to come forward with evidence rebutting the Government's proof—which they failed to do.

Defendants argue in a footnote that "shifting the burden [of production] to the defense raises constitutional concerns." (Wen Dkt. 74 at 5 n.2). As a threshold matter, "[i]t is well settled . . . that a court need not consider arguments relegated to footnotes[.]" *FTC v. Tax Club, Inc.*, 994 F. Supp. 2d 461, 471 n.1 (S.D.N.Y. 2014); *see also Primmer v. CBS Studios,*

---

[4] In other cases, the Fifth Circuit has placed the burden of production on a defendant to establish a credit against loss. *See, e.g., United States v. Mahmood*, 820 F.3d 177, 194 (5th Cir. 2016) (to receive credit against loss, defendant "bore the burden to proffer evidence that the services . . . rendered . . . were legitimate and that [victim] . . . would have paid for those services but for his fraud."); *United States v. Phipps*, 595 F.3d 243, 248 (5th Cir. 2010) (where defendant "offered no evidence as to the value of the tapes and educational materials he suggests that the court should have considered," district court did not err in failing to reduce loss amount by the value of the materials received by program participants enrolled in defendant's fraudulent program).

*Inc.*, 667 F. Supp. 2d 248, 256 n.4 (S.D.N.Y. 2009) ("[B]ecause the argument is made wholly in a footnote . . ., the Court may choose to disregard it."); *cf. Diesel v. Town of Lewisboro*, 232 F.3d 92, 110 (2d Cir. 2000) ("We do not consider an argument mentioned only in a footnote to be adequately raised or preserved for appellate review." (internal quotation omitted)). Defendants have raised their constitutional argument solely in a footnote, and the Court would therefore be within its discretion to decline to consider it.

In any event, Defendants' constitutional argument lacks merit. While due process considerations generally require the Government to bear the burden of proof with respect to sentencing facts, "[t]he Due Process Clause does not require that the government prove the absence of every possible exception or mitigating circumstance." *United States v. Restrepo*, 884 F.2d 1294, 1296 (9th Cir. 1989); *see also United States v. Bjorkman*, 270 F.3d 482, 493 (7th Cir. 2001) ("[I]t is proper to require the defendant to bear the burden of proving the exception recognized in Application Note 3 in order to avoid the application of an otherwise properly supported enhancement. This conclusion is consistent with the language of Application Note 3, [and] with due process principles[.]"). A number of courts have required a defendant to come forward with evidence in the sentencing context, including establishing a credit against loss, as reflected in the cases cited in the December 21st Decision and this Decision and Order. In fact, the Second Circuit has approved of burden shifting with respect to establishing intended loss in *United States v. Confredo*, 528 F.3d 143 (2d Cir. 2008). The Second Circuit found that, with respect to the intended loss amount, once the government demonstrated the potential loss associated with a defendant's crimes, the burden shifted to the defendant to "produc[e] 'evidence to demonstrate that he actually intended to cause a lesser

loss.'" *Id.* at 152 (quoting *United States v. Geevers*, 226 F.3d 186, 192 (3d Cir. 2000)). In reaching this conclusion, the *Confredo* court expressly adopted the "sensible approach" set forth in *Geevers*. *Id.* In *Geevers*, the Third Circuit noted that "though the government bears the burden of proof in guidelines cases, the burden of production may shift to the defendant once the government presents prima facie evidence of a given loss figure." 226 F.3d at 188. In other words, there is simply no merit to Defendants' argument that placing the burden of production on Defendants after the Government established a *prima facie* case of loss created a constitutional due process issue.

2. **The Government Demonstrated a *Prima Facie* Loss of $8,410,900**

Turning to Defendants' second argument, and as touched upon in the above discussion, the Government amply proved that the *prima facie* loss amount in this case was $8,410,900. As the Court discussed at length in the December 21st Decision, the Government demonstrated that it did not receive what it bargained for, because any research that was ultimately done was not performed by those who were supposed to perform it, nor was it funded by the entities that were supposed to fund it. Moreover, the Government's money was not used to help a minority-owned small business flourish, but was instead used for Defendants' own fraudulent purposes. Under these circumstances, as the Court concluded in the December 21st Decision, the Government established that the work purportedly done by Defendants was without value to it.

*United States v. Canova*, 412 F.3d 331 (2d Cir. 2005), discussed at page 30 of the December 21st Decision, is particularly instructive as to this point. The defendant in *Canova* had defrauded the government in part by falsely claiming that his company had complied with

Medicare requirements testing it had performed on pacemakers. *Id.* at 335-36. Defendant argued (and produced evidence) that "the tests performed by [his company] were as clinically sound as the tests required by Medicare," and argued on that basis that the government had not sustained a cognizable loss as a result of his fraud. *Id.* at 352. The Second Circuit squarely rejected that argument, explaining:

> When a party fraudulently procures payment for goods or services by representing that they were produced or provided according to certain specifications, it is not the task of a sentencing court to second-guess the victim's judgment as to the necessity of those specifications. Whether the testing time on a pacemaker, the number of rivets on an airplane wing, or the coats of paint on a refurbished building is a matter of necessity or whim, the fact remains that the victim has been induced to pay for something that it wanted and was promised but did not get, thereby incurring some measure of pecuniary "loss."

*Id.*; *see also United States v. Mahmood*, 820 F.3d 177, 194 (5th Cir. 2016) (in Medicare fraud case, where Medicare was the victim, discussing when Medicare receives "value" within the meaning of the credits against loss rule: "We must consider that Medicare is the victim of [the defendant's] fraud and that Medicare receives 'value' within the meaning of U.S.S.G. § 2B1.1 comment (n. 3E(i)) when its beneficiaries receive legitimate health care services for which Medicare would pay but for a fraud. Thus, if . . . Medicare would have paid for the services that [the defendant] . . . rendered to patients but for [the defendant's fraud], then [the defendant] is entitled to a credit for the fair market value of those services. By contrast, if . . . Medicare would not have paid for the services that [the defendant] . . . rendered to patients, then [the defendant] is entitled to no such credit." (internal citations omitted)).

Here, the Government set specifications for granting money under the SBIR/STTR programs, and it would not have paid money to a business that did not meet those

specifications. The Government gave Defendants $8,410,900 to perform research conforming to certain specifications and Defendants did not perform research to those specifications. The Government established that if Defendants had honestly represented the nature of their business and research—that the research was not being performed by those Defendants identified and that the business was not being funded by legitimate third parties—Defendants would not have qualified for the SBIR/STTR programs. As the Government pointed out, these awards were competitive in nature, and Defendants managed to usurp opportunities from other legitimate small businesses based on their false representations. Defendants fraudulently misrepresented that they met the Government's specifications, thus defeating the purpose of Defendants' participation in the programs—and negating any value provided to the Government.

As set forth in the December 21st Decision, the purpose of the specifications set forth by the Government was to ensure that the money at issue was being used to fund legitimate small businesses. Here, the Government established that the money was not used for that purpose. On these facts, the Government amply proved that the full $8,410,900 was a loss, because it was not used for the purposes for which it was meant to be used and the Government established that whatever work was performed by Defendants held no value for the Government.[5] Again, *Canova* is instructive. There, the Second Circuit explained that "a

---

[5] Indeed, as the Government points out in its opposition papers, the evidence before the Court shows that a significant portion of the funds went toward Defendants' personal use. (*See* Wen Dkt. 77 at 6). Defendants admitted to this fact as part of their pleas. (*See, e.g.*, Wen Dkt. 43 ¶ 4(a) ("A substantial amount of the fraudulently obtained money went toward the personal use of BEN WEN and Jessica Zhang."); ¶ 4(h) ("Defendant BEN WEN and codefendant Jessica Zhang used a substantial portion of the proceeds of their fraud schemes

victim's loss in a substitute goods or services case [does not] necessarily equal the full contract price paid," but that instead the Court should consider factors such as the cost to the victim in achieving its intended purpose. *Canova*, 412 F.3d at 353-54. Here, to achieve its intended purpose (that is, to provide a legitimate small business with $8,410,900 in funding towards commercially viable research), the Government would have to start from scratch and find some other, legitimate small business to fund in the same amount.

Defendants argue that the Government was required to "present evidence that the services provided by [Defendants] to the government were worthless" in order to establish the *prima facie* loss amount. (Wen Dkt. 74 at 7). Not only did the Government establish that Defendants' services provided no benefit to it, but Defendants fundamentally misunderstand the Credits Against Loss Rule. The Credits Against Loss Rule does not affect how loss is calculated initially. Instead, it provides that once a *prima facie* loss amount has been determined, it must then "be reduced by . . . the fair market value of . . . the services rendered . . . to the victim before the offense was detected." U.S.S.G. § 2B1.1 Application Note 3(E)(i); *see also United States v. Crummy*, 249 F. Supp. 3d 475, 486 (D.D.C. 2017) ("[T[he Guidelines broadly provide a two-step framework for calculating the loss amount for section

---

for their own personal benefit.")). Under the circumstances, the Court finds it incredible for Defendants—on the one hand, to be admitting that they engaged in a fraudulent scheme based on deceptive conduct that resulted in substantial financial benefits to Defendants personally—but on the other hand, to be claiming to this Court that they actually provided value to the Government of over $8 million (or even equal to $4,910,900, which is the relevant threshold figure for loss calculation purposes (*see* December 21st Decision at 32)). While Defendants reserved the right in the plea agreements to argue about the loss amount, they are treading a fine line between legitimate advocacy concerning the loss figures and minimizing their criminal conduct to such a degree that they fail to accept responsibility. Whether Defendants have managed to effectively navigate that line will be addressed at sentencing.

2B1.1(b)(1) purposes . . . : first, the application notes outline various rules of construction to assist courts in defining loss, and second, the notes provide that the loss shall be reduced by certain factors, including the fair market value of the services rendered.") (quotations and alteration omitted); *United States v. Foster*, No. 1:14-cr-324, 2016 WL 3958895, at *12 n.9 (M.D. Pa. July 22, 2016) (explaining that the text of the Credits Against Loss rule indicates "an initial loss determination is separate from a later determination of credits against loss."). The Credits Against Loss Rule thus recognizes that "the amount of loss in a fraud case, unlike that in a theft case, often depends on the actual value received by the defrauded victim." *United States v. Nagle*, 803 F.3d 167, 180 (3d Cir. 2015) (quotation omitted). Here, the Government showed that the services Defendants provided were worthless to the Government because they did not and could not achieve the purposes the Government had set out to achieve—namely, to support legitimate entrepreneurship. In other words, the "actual value" to the Government of the services Defendants claim to have provided was zero, and the Government would not have agreed to pay anything for them through the SBIR/STTR programs had Defendants been honest. Accordingly, the Court rejects Defendants' argument that the Government failed to prove the *prima facie* amount of loss.

### 3. **Defendants Did Not Provide Value to the Government**

Finally, the Court rejects Defendants' argument that they provided "some evidence" of the value of the services they claim to have provided the Government, and therefore satisfied their burden of production. The evidence Defendants point to consists in large part of their own "unsubstantiated statements," which are "not enough to counter or even question the court's acceptance of the government's proof of loss." *United States v. Swanson*, 394

F.3d 520, 527 (7th Cir. 2005). The reports and other documents compiled by Defendants are inherently unreliable, because Defendants' fraud permeated their entire enterprise. Moreover, while Defendants cite to interest expressed in their research by outside private entities, the facts establish that during the relevant time period, it was federal and state governments that were funding Defendants' endeavors through these and other grant programs. (*See* Wen Dkt. 61 at 10). The evidence Defendants point to at most establishes that they did perform some research, but the Court is unpersuaded that the research provided any value to the Government. *See United States v. Washington*, 715 F.3d 975, 985 (6th Cir. 2013) (defendant failed to show that a credit against loss should be applied where he "provided no estimates of the value of the work completed" other than documents that were part of his fraud); *see also United States v. Byors*, 586 F.3d 222, 225-26 (2d Cir. 2009) (while defendant was entitled to credit for amounts repaid to victims, he was not entitled to credit for legitimate business expenditures representing money he spent to capitalize his business; defendant presented evidence of these expenditures at his sentencing hearing but the Second Circuit agreed with the district court's rejection of these expenditures as representing services rendered to the victims; "The Guidelines do not require a loss to be offset by any legitimate expenditures, as defendant argues, but rather by 'value' that has been conferred on the victims in the form of money or property returned or services rendered."). The Court finds no reason to disturb its conclusion in the December 21st Decision on the record before it.

## CONCLUSION

For all the foregoing reasons, the Court finds that Defendants have not shown that reconsideration of any portion of the December 21st Decision is warranted. Accordingly, Defendants' motions for reconsideration (Wen Dkt. 74; Zhang Dkt. 74) are denied.

SO ORDERED.

_____
ELIZABETH A. WOLFORD
United States District Judge

Dated: January 30, 2019
      Rochester, New York